UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| DANNY GALLAGHER,<br><br>              Plaintiff,<br><br>     vs.<br><br>MATERNITYWISE INTERNATIONAL,<br>LLC, ANNE CROUDACE, ELIZBETH<br>ANOATUBBY, EMILEE SALDAYA,<br>RACHAEL BROWN, JENNA CHIDESTER,<br>STEPHANIE GILBERT, JORDAN ASHLEY<br>HOCKER, BETHANY KIRILLOVA,<br>SAMANTHA LAJOIE, AERIN LUND,<br>KATE PAVLOVSKY, CHANNA JAYDE<br>WALZ, MADDISON WEIKLE, ESME<br>WHRITENOUR, NICOLETTE RAYMOND,<br>ELIZABETH GEFTAKYS, JULIE BELL,<br>CARA GWIZD, HOLLY LEPPARD-<br>WESTHAVER, ELOISE VICTORIA,<br>JANE DOE ONE,  JANE DOE TWO,<br>JANE DOE THREE,  DOES 1-10,<br>INCLUSIVE;<br><br>              Defendants. | CIV. NO. 18-00364 LEK-KJM |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND JOINDERS THEREIN**

On April 20, 2020, Defendants MaternityWise

International LLC ("MaternityWise"), Anne Croudace ("Croudace"),

Maddison Sisley Boulter ("Boulter"), Jane Hopaki ("Hopaki"),

Kate Pavlovsky ("Pavlovsky"), and Aerin Lund ("Lund" and

collectively "MaternityWise Defendants") filed their Motion for

Summary Judgment ("Motion"). [Dkt. no. 163.] On April 23,

2020, Defendants Emilee Saldaya ("Saldaya") and Vivian Chao Best

("Best") filed a substantive joinder in the Motion ("Saldaya-Best Joinder"), and *pro se* Defendants Bethany Kirillov ("Kirillov") and Stephanie Byers ("Byers" and all collectively with the MaternityWise Defendants "Defendants") both filed substantive joinders ("Kirillov Joinder," "Byers Joinder" and collectively "Joinders"). [Dkt. nos. 168, 170, 171.] On May 26, 2020, Plaintiff Danny Gallagher ("Gallagher") filed his memorandum in opposition to the Motion ("Memorandum in Opposition"). [Dkt. no. 176.] Also on May 26, 2020, Gallagher filed his memorandum in opposition to the Joinders ("Joinder Opposition"). [Dkt. no. 179.] On June 16, 2020, the MaternityWise Defendants filed their reply ("MaternityWise Reply"), and Saldaya and Best filed theirs. [Dkt. nos. 192, 194.] The Court finds these matters suitable for disposition without a hearing pursuant to Local Rule 7.1(c). On November 6, 2020, this Court issued an entering order informing the parties of its ruling on the Motion. [Dkt. no. 213.] The instant Order supersedes that entering order. The Motion and Joinders are hereby granted in part and denied in part for the reasons set forth below.

## BACKGROUND

### I.   General Factual Background

Gallagher filed this action on September 25, 2018. [Complaint for Damages (dkt. no. 1).] The operative pleading is

Gallagher's Fourth Amended Complaint for Damages ("Fourth Amended Complaint"), filed May 22, 2019.  [Dkt. no. 79.]  In sum, Gallagher is a self-described doula, lactation consultant, and maternity photographer and videographer, and Defendants wrote allegedly defamatory statements about him online.[1]

In 2018, Gallagher marketed himself on Facebook as a doula, lactation consultant and maternity photographer and videographer.  [Def.'s Concise Statement of Facts in Supp. of Motion for Summary Judgment ("MaternityWise CSOF"), filed 4/20/20 (dkt. no. 165), at ¶¶ 1, 4; Gallagher's concise statement of facts in opp. to the MaternityWise CSOF ("Gallagher's MaternityWise CSOF"), filed 5/26/2020 (dkt. no. 177), at ¶¶ 1, 4 (admitting MaternityWise CSOF at ¶¶ 1, 4, insofar as Gallagher advertised as indicated in 2017 and 2018); Saldaya and Best's concise statement of facts ("Saldaya-Best CSOF"), filed 4/23/20 (dkt. no. 169), at ¶ 1; Gallagher's concise statement of fact in opp. to the Saldaya-Best CSOF ("Gallagher's Saldaya-Best CSOF"), filed 5/26/20 (dkt. no. 180), at ¶ 1 (admitting Saldaya-Best CSOF at ¶ 1).  In addition to his personal Facebook page, Gallagher also maintained Facebook pages for his pregnancy and birth related businesses under the names

---

[1] The facts presented are materially undisputed unless otherwise noted.  Factual disputes and evidentiary objections are addressed below.

"Danny the Doula" ("DTD") and "Maternity in Motion" ("MIM").
See Decl. of Danny Gallagher in supp. of opp. to Motion and
Joinders ("Gallagher Decl."), filed 5/26/20 (dkt. no. 184), at
¶¶ 36-37; MaternityWise CSOF, Yolken Decl., Exh. J (excerpts of
trans. of Gallagher's  2/26/20 depo. ("Gallagher Depo.) at 40.
Gallagher joined a number of pregnancy or doula related Facebook
groups and lied about his background and experience as a doula,
including but not necessarily limited to: 1) he once had a
fiancé who committed suicide; 2) he delivered a baby under a
highway overpass; and 3) was present at more than fifty births
before the age of eighteen. [MaternityWise CSOF at ¶¶ 6-10;
Gallagher's MaternityWise CSOF at ¶¶ 6-10 (admitting
MaternityWise CSOF at ¶¶ 6-10 in relevant part).]  In March
2017, Gallagher created a Facebook profile under the name
Samantha Cristinzio, which included a profile picture depicting
a pregnant woman, where he posted content related to
breastfeeding, and after filing the instant case, contacted some
of the Defendants to gather information about the case as
Samantha Cristinzio, under the pretense that Samantha Cristinzio
was thinking about doing a maternity photo shoot with Gallagher.
[MaternityWise CSOF at ¶¶ 13-15 (some citations omitted) (citing
MaternityWise CSOF, Decl. of Kevin A. Yolken ("Yolken Decl."),
Exh. E (screenshots of Facebook profile bearing the name

4

Samantha Cristinzio)); Gallagher's MaternityWise CSOF at ¶¶ 13-15 (admitting MaternityWise CSOF at ¶¶ 13-15 in relevant part).]

Gallagher was a member of a Facebook group called Heart and Hustle, which was administered by Angela Gallo.  On July 21, 2017, Gallagher posted an article to Heart and Hustle titled "Mum Makes Thousands Of pounds a Month Selling Erotic 'Body Positive' Photos" (the "Article").  See Gallagher Decl. at ¶¶ 28-29 (citing MaternityWise CSOF, Yolken Decl., Exh. J (Gallagher Depo.), Exh. 7 (screenshot of Facebook post of the Article)).  Pavlovsky, also a member of Heart and Hustle, responded to Gallagher's post of the Article.  [MaternityWise CSOF at ¶¶ 20-21; Gallagher's MaternityWise CSOF at ¶ 20-21 (admitting MaternityWise CSOF at ¶¶ 20-21 to the extent that Pavlovsky was a member of Heart and Hustle and conversed with Gallagher related to the Article).]  In a private conversation with Pavlovsky, Gallagher indicated that he had helped other women create platforms to sell erotic content, including by editing their photos and videos.  [MaternityWise CSOF at ¶¶ 24-25; Gallagher's MaternityWise CSOF at ¶¶ 24-25 (admitting MaternityWise CSOF at ¶¶ 24-25 in relevant part).]  Pavlovsky and Gallagher discussed the prospect of Pavlovsky creating and selling her own erotic or sensual content.  See MaternityWise CSOF, Decl. of Kate Pavlovsky ("Pavlovsky Decl.") at ¶¶ 10-15 (describing the Facebook conversation she had with Gallagher).

In the course of their conversation, Gallagher sent Pavlovsky photos of a person he identified as "Sam" as examples of content other "mamas" were making.[2] [MaternityWise CSOF, Yolken Decl., Exh. J (Gallagher Depo.), Exh. 6 (Facebook conversation between Gallagher and Pavlovsky) at Gallagher_Fed 0455-59.]

A few days after her conversation with Gallagher, Pavlovsky saw a Facebook post by Angela Gallo that said she had received complaints about Gallagher and removed him from Heart and Hustle. [MaternityWise CSOF, Pavlovsky Decl. at ¶ 19.] Pavlovsky responded on Facebook, and described her experience with Gallagher, including commenting that Gallagher "had attempted to lure [her] into amateur pornography." [Id. at ¶¶ 20-21.] Pavlovsky learned that Gallagher had shared screenshots of portions of their conversation with Angela Gallo and another person named Peta Tuck. In response, Pavlovsky shared screenshots of the remainder of their conversation. [Id.

---

[2] The woman in the photographs is Samantha Baldwin, who uses the Facebook profile name "Sam Ross." [Decl. of Samantha Baldwin ("Baldwin Decl."), filed 5/26/20 (dkt. no. 182), at ¶ 2.] She gave Gallagher her "consent to share the photos with select persons because [Gallagher] knew of other people who wanted do [sic] what [she] was intending on doing." [Id. at ¶ 8.] The Court would like to acknowledge with compassion that boudoir-style pictures of Ms. Baldwin were distributed beyond her consent over the internet, and feature prominently in the evidence of this case. The Court sincerely expresses its condolences that Ms. Baldwin's image has been distributed so far beyond the bounds of her consent and will address that part of the evidence with care.

at ¶ 23.]  Pavlovsky also sent portions of the conversation she
had with Gallagher to Saldaya and others.  [Gallagher's
MaternityWise CSOF at ¶ 47; MaternityWise Defendants' Reply to
Plaintiff's Additional Material Facts Set Forth in Plaintiff's
Separate Concise Statement of Facts in Opposition to Defendants'
Motion for Summary Judgment ("MaternityWise Reply CSOF"), filed
6/16/20 (dkt. no. 192), at ¶ 47 (admitting Gallagher's
MaternityWise CSOF at ¶ 47).]

     Croudace is the owner of MaternityWise.
[MaternityWise CSOF, Decl. of Anne Croudace ("Croudace Decl.")
at ¶ 1.]  MaternityWise "provides education, training, and
certification in various birth-related disciplines."  [Id. at
¶ 2.]  Croudace was planning a MaternityWise workshop to take
place in Hawai`i in April 2018 when she was contacted by
Gallagher.  [Id. at ¶¶ 3-4.]  Gallagher told her about: his goal
of becoming a doula; how his pregnant fiancé committed suicide;
his issues with homelessness and obesity; how he had assisted
with births under a bridge; and how he could not afford to
attend MaternityWise's Hawai`i workshop, but was willing to
provide photography and videography services in exchange for
being allowed to attend.  [Id. at ¶¶ 4-6.]  Croudace agreed to
the exchange, and Gallagher attended the MaternityWise workshop.
In May and June of 2018, Croudace received complaints and
concerns that Gallagher was claiming to be certified by

MaternityWise.  Croudace confirmed for herself that Gallagher was purporting online to be certified by MaternityWise.  Id. at ¶¶ 9-10; MaternityWise CSOF at ¶ 27, 34; Gallagher's MaternityWise CSOF at ¶ 27, 34 (admitting MaternityWise CSOF at ¶ 27, 34).  Croudace asserts that she received complaints that Gallagher was involved in pornography and that he had been sexually inappropriate and unprofessional.  [MaternityWise CSOF at ¶ 29 (citing MaternityWise CSOF, Croudace Decl. at ¶¶ 9-13; MaternityWise CSOF, Yolken Decl., Exh. I (screenshots of messages about Gallagher)); Gallagher's MaternityWise CSOF at ¶ 29 (to the extent that Gallagher's MaternityWise CSOF at ¶ 29 is responsive to MaternityWise CSOF at ¶ 29, it only objects to the characterization of complaints received as a "flood," and asserts that the alleged number of complaints received is not supported by the evidence).]

According to Croudace, when she confronted him, Gallagher admitted to her over the phone and via text message that he was involved in pornography and assisted others in creating platforms to sell such content over the internet.  [MaternityWise CSOF, Croudace Decl. at ¶¶ 14-15.]  Gallagher denies that any such phone call occurred and denies ever making such admissions.  [Gallagher's Decl. at ¶ 31-32.]  Croudace also asserts that she was provided with evidence of conversations wherein Gallagher was "enticing women to create adult content of

their own and offering to assist and provide advice . . . ."
[MaternityWise CSOF, Croudace Decl. at ¶ 13.]

In response to the information Croudace had received, MaternityWise issued its Memorandum of Official Statement ("MOS") on June 5, 2018.  [MaternityWise CSOF at ¶ 35; Gallagher's MaternityWise CSOF at ¶ 35 (admitting MaternityWise issued the MOS); MaternityWise CSOF, Yolken Declaration, Exh. J (Gallagher Depo.), Exh. 11 (MOS).]  Although it did not identify Plaintiff by name in the MOS, MaternityWise "renounced any affiliation with Plaintiff for misrepresenting that he was certified," and expressed its view that pornography is harmful and incompatible with the work of doulas.  [MaternityWise CSOF, Yolken Declaration, Exh. J (Gallagher Depo.), Exh. 11 (MOS).]

According to Gallagher, in June 2018 he was featured in Maui Mama Magazine.  Gallagher asserts that this suggests he had a good reputation in the Maui birth community.  [Gallagher Decl. at ¶ 45.]

## II. The Defendants' Allegedly Defamatory Statements

Due to the volume of statements at issue, they are addressed by party rather than chronologically.

### A. Pavlovsky

Pavlovsky recounted her experience with Gallagher in a Facebook post, explaining that she had initially been interested in creating erotic content.  However, she continued:

9

. . . Then, I started replying slower and slower to him because I was feeling more and more uncomfortable with the situation. I never let on to Danny that I was uncomfortable that is true. I never said stop talking to me I'm creeped out. This was still while I thought everyone else trusted this dude! I thought I was paranoid. But I definitely knew he had told me that he did this with many of his female friends – he helped them create online sexual content. Yet again he was trying to normalize the idea in my mind. But really it sent up red flags like hmmm why do you help so many women create sexual content for free? So eventually in our last convo he sent me a link to a porno site. [O]nce I actually clicked the link I stopped responding and got ultra grossed out. I still didn't speak up. Not until everyone else spoke out against him.

Did I ever tell him to stop? No, I continued on having a convo with him because I didn't want to be weird to a person I might have to continue interacting with on here and other groups. I just wanted the convo to fade away.

[I]s it possible that MY not being clear made him think he wasn't doing anything wrong? Yes. I've reread the convos and I think this is a possibility that in his mind he wasn't doing anything wrong because I never told him to stop and I even asked him questions about what the plan would be IF I decided to create content like that to make money.

[Decl. of Jose Utzurrum in opp. to Motion and Joinders ("Utzurrum Decl."), filed 5/27/20 (dkt. no. 185), Exh. 15 (documents produced with and referred to in Aerin Lund's Response to Plaintiff's First Request for Production) at MaternityWise_00382 (emphases in original).]

She also posted,[3] in relevant part:

> However, honestly, I am still creeped out by him.
> I felt lured into the situation.  And I do think
> he does this with MANY women.  I know for a fact
> our own Sam Ross was lured into it and many other
> women (according to his own words) have been too.
> In my mind when I was thinking of Summers all I
> saw was her Instagram worthy stuff so it was
> risqué but not porn.  When I realized he was
> talking about creating porno videos and other
> content I was very put off (yet again no I didn't
> say this in type to him.) maybe I'm in the wrong
> for never speaking up. . . .

[Id. at MaternityWise_00385 (emphasis in original).]  Pavlovsky

also maintained a Facebook profile under the name Opal Essence.

[Gallagher's MaternityWise CSOF at ¶ 48 (some citations omitted)

(citing Utzurrum Decl. at ¶¶ 27-28, Exh. 15  at MaternityWise-

_000325 (documents produced with and referred to in Aerin Lund's

Response to Plaintiff's First Request for Production));

MaternityWise Reply CSOF at ¶ 48 (admitting Pavlovsky also had a

Facebook profile using the name Opal Essence).]  As Opal

Essence, Pavlovsky posted:

> This man attempted to lure me into sex work.  He
> has done the same to many women.  He is a REAL
> DANGER to women in his local community.  This man
> is a predator and solicits women for nude photos
> and amateur porn involving pregnant women and
> lactating women.  Everyone who is calling him out

---

[3] This post lacks a username.  On a motion for summary
judgment, "[t]he evidence of the non-movant is to be believed,
and all justifiable inferences are to be drawn in his favor."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)
(citation omitted).  It is reasonable to infer that Pavlovsky
made the post.

> has proof of his actions, but not everyone wants
> to spread it all over the internet.
>
> This is not petty.  This man is a sexual
> predator.  He should never be allowed in a birth
> room as it has been made clear he is very aroused
> by birth, pregnancy, and breastfeeding.  We are
> not trying to tear him down.  He is not a victim.
> We are trying to protect the true victims in this
> situation – the women who he will prey upon.

[Utzurrum Decl., Exh. 15 (documents produced with and referred

to in Aerin Lund's Response to Plaintiff's First Request for

production) at MaternityWise_000325.]

Pavlovsky, on her own Facebook page, posted a

statement describing an eight-step method Gallagher allegedly

used in preying on his victims.  [Gallagher's MaternityWise CSOF

at ¶ 49 (some citations omitted) (citing Utzurrum Decl. at ¶ 26,

Exh. 13 (Defendant Kate Pavlovsky's Response to Plaintiff's

First Requests for Admission [Fed. R. Civ. P. 26 and 36]

("Pavlovsky RFFA") at Question 1)); MaternityWise Reply CSOF at

¶ 49 (admitting "Pavlovsky expressed her opinions about

[Gallagher] based upon her experience").]  The post stated, in

relevant part:

> Please watch out for a predator infiltrating
> natural birth groups on social media.  This is
> his MO:
>
> 1. He gets permission from the group moderator.
> Then he posts an intro full of heart-rending
> tales of disadvantage and trauma.  This incites
> sympathy from women conditioned to be caring.

2. Having gained access to the group, he then makes ego-centric and grandiose posts.  This hooks into the way that women are socialized to praise, adulate and stroke the egos of men, and to show humility in the face of male bragging.

3. Around this time, any women in the group with finely tuned radars for narcissism, bullshit or perve are likely to call him on a breach of confidentially or some other crossing of basic boundaries.  At this point, he arcs up defensively way out of proportion to the issue.  Then some women in the group are likely to rush to his defence and make allowances for him.  The ones with misgivings then start to doubt themselves and back down a little so as not to cause upset within the group.

4. He is a master manipulator at using women's strengths against them.  He gives the impression that he is doing everything with the Moderator's permission.  He infers that he has special favour and a special connection with the group leader, or any woman of prominence and influence.  He piggy-backs on the trust and credibility that lead woman has with the group by invoking her. Members then feel constrained to complain about him or report him, because of their love and loyalty for their LEADER – and they don't want to seem to be questioning her judgment or second-guessing what is apparently her call (according to his claims).  In this way, he subverts the loyalty of women and uses it against them.  In one case, he claimed a leading midwife in his community was his "mentor".  She wasn't.  In our group, he claimed that he was in business with our leader and that she was collaborating with him.  She wasn't.

5. Then he posts polls about whether he should stay in the group or leave.  This appeals to women's eagerness to express an opinion or cast a vote.  In our culture women are often not consulted, don't have access to forums and are thus-under-represented, so this opportunity is highly attractive.

13

6. He then incites division in the group.  He plays the misunderstood, misjudged victim and those whose alarm bells are loudly clanging are not only depicted by him as mean, judgmental, non-inclusive and sexist – but other women, desperate to not be written off by A Man as being a "nasty woman" quickly round on the dissenters and tip staggering dump-truck loads of internalized misogyny all over them.  But this is merely a diversion.  While he continues to stoke the drama and strife, he's actually quietly going about his real work.

7. Which is to trawl the group for women who are insecure or unstable in terms of their financial security, self-esteem or in need of sexual validation.  He wins their trust, makes alluring promises and grooms them to provide naked photos of themselves, or their underwear, to sell to a select audience of men.  Guess who is the broker. He is a predatory pimp, no less, and he is *not* a doula.

8. Fall-out from the above subversions are diverse.  Some women may feel ashamed that they trusted him, (or that they pretended to trust him for a while in order to figure out if he was legit or not).  Vulnerable women talk about how nice and kind he was to them, not aware that he is grooming them.  Other women turn on those who express a negative or distrustful opinion of him, to the point of screen-shotting their posts and sending them to him, seemingly unaware that he has manipulated them into acting has his handmaids.  He acts gracious in the face of criticism publically [sic], while privately attacking those who confront him venomously.

The point of this post is not only to warn about this individual and other like him.  It's so that we can question, and examine, how we as women – from the naïve ingenues to the jaded, skeptical crones, can be so easily manipulated, exploited and turned on each other. . . . .

[Gallagher Decl., Exh. 7 (screenshots of Kate Pavlovksy's Facebook page as it existed on or about 6/4/18 ("Eight-Step Message")) at PageID #: 2901-02 (emphasis in original); Utzurrum Decl., Exh. 13 (Pavlovsky RFFA) at pgs. 2-4, Request No. 1.[4]]

Another Facebook user replied to the above post, stating:

> The comments on his business page from women defending him are pretty scary.  These doulas are claiming that they "know" him because they have spent hours chatting with him, talking on the phone, and talking to him on fb groups – but they've never actually met him.  I want to comment so badly and ask them what they'd think if their daughter came to them and told them about an amazing guy they met online, and how well they knew him because they'd spent hours chatting him up online . . . the internet is so scary.  You could download a dating app today and set up 10 dates, I guarantee at least 3 of them wouldn't live up to their online persona – and that's not even the scary side of what you can get away with online these days.  How these women and specifically doulas who are trained to protect a woman's space are defending him without ever having met him in person is baffling to me.

[Id. at PageID #: 2902 (ellipsis in original).]  Pavlovsky replied,

> I love everything about this comment here because I have gone through all of these same thoughts. Especially the thought of. . what if these women were your daughters?  Even if you don't think he is in the wrong to approach women about getting them into sex work . . . . do you want men out there who would say or do things to lure your daughter into taking nude photos or selling her panties?!  It's outrageous.  The thing is we all

_____

[4] A portion of step six was cut off in Exhibit 7, and was therefore supplemented with the version of the Eight Step Message reproduced in the Pavlovsky RFFA.

> do have proof.  It is not yet compiled altogether
> but it won't be long til it is and everyone can
> see his patterns.  It makes me sick knowing there
> are WOMEN defending him.  He does not belong in
> the birth world.  This work is not safe if he is
> able to infiltrate our groups this way.  He is a
> master manipulator which is why we all have to be
> together in defending ourselves against him.

[Id. (ellipses and emphasis in original).]  Finally, in discovery, Gallagher asked that Pavlovsky admit that she had never communicated with any person who claimed to be manipulated by Gallagher for his sexual gratification, to which Pavlovsky responded:

> Deny.  I have communicated with a woman named
> Sam[5] who believed she was sending Danny
> pornographic material of her own accord.  She was
> lured into talking with him by the same post in
> the Heart and Hustle Facebook group.  He sent me
> proof of their communications to try to convince
> me to be comfortable sending him pornographic
> content.  Sam was convinced that she was doing so
> consensually, but I believe she was manipulated
> in the exact same way I was (I deduced this
> because I read the posts and because he used the
> same "grooming" techniques on me).  I don't
> recall communicating personally with any other
> person, I have only seen screenshots of comments
> from women claiming that he solicited them for
> pornographic content and for panties (that he was
> selling or keeping I don't know).

[Utzurrum Decl., Exh. 13 (Pavlovsky RFFA) at pg. 11, Request No. 19.]

---

[5] This is interpreted as a reference to Sam Ross, also known as Samantha Baldwin.  See Baldwin Decl. at ¶¶ 24-28 (describing the communications between Ms. Baldwin and Pavlovsky).

16

**B.   Saldaya**

Saldaya runs the Facebook group Free Birth Society ("FBS"). Gallagher's MaternityWise CSOF at ¶ 52; Saldaya and Best's reply concise statement of fact ("Saldaya-Best Reply CSOF"), filed 6/16/20 (dkt. no. 194).[6] On June 3 and 4, 2018, Saldaya sent or posted the following (or a substantially similar message) to at least fifty-three recipients over Facebook ("Warning Post"):

> Warning.  Danny Gallagher is a predator who has infiltrated the birth world and needs to be removed immediately.  He has been removed from the big groups and the admins of Doula Talk are reporting him to his certifying board.  He has been caught victimizing women and his scheme has been exposed.  He trawls birth groups for women who are insecure or unstable in terms of their financial security, self esteem or in need of sexual validation.  He contacts them privately, wins their trust, makes enticing promises, and grooms them to provide naked photos of themselves to sell to a select audience of men.  He's the broker.  He is a predatory pimp, he is not a doula.  He has harassed a number of women online to sell them their used panties.  This has all been confirmed.
>
> I see that you are internet friends with him and wanted you to know.  This is very serious, he is a sexual predator and is dangerous.  Please help me in shutting this shit down.

---

[6] Pursuant to LR 56.1(g) of the Local Rules of Practice for the United States District Court for the District of Hawaii ("Local Rules"), "material facts set forth in the movant's concise statement will be deemed admitted unless controverted by a separate concise statement of the opposing party."

See, e.g., Utzurrum Decl., Exh. 8A (Emilee Saldaya's Responses to Plaintiff's First Request for Production of Documents Dated October 18, 2019) at ES 000041; Gallagher's MaternityWise CSOF at ¶ 57; Saldaya-Best Reply CSOF at ¶ 57 (admitting Saldaya sent and posted the Warning Post). Saldaya also sent a message substantially similar to the Eight-Step Message to at least eight recipients. [Gallagher's MaternityWise CSOF at ¶ 58; Saldaya-Best CSOF at ¶ 58 (admitting Saldaya sent the Eight-Step Message).] Gallagher asserts that Saldaya accused him of being a "perpetrator in rape," however, Saldaya denies the accusation. [Gallagher's MaternityWise CSOF at ¶ 60 (citing Gallagher's Decl. at ¶ 44, Exh. 10 at 26 (screenshot of Saldaya's Facebook comment "#rapeculture" during a series of posts discussing Gallagher)); Saldaya-Best Reply CSOF at ¶ 60 (denying Gallagher's MaternityWise CSOF at ¶ 60).]

On June 16, 2018, on the DTD Facebook page, Saldaya posted the following:

> "Paula Brown Ricchi Are you supportive of a man being in the birth industry, a lactation consultant, and also grooming pregnant and breastfeeding women to be on porn sites? I would certainly not want my "male doula" or my "male lactation consultant" to also be telling other moms how to lactate for money on porn sites. But to each their own I suppose" and "Paula Brown Ricchi I'm sorry I am a bit confused, does that mean you either haven't seen the proof in which he is caught in the act of doing this, or you have experienced him to be transparent about both infiltrating the birth world and grooming women

18

for sex work?  I'd be happy to share the screen
shots the women have shared off of this review,
as screenshots get taken down here.  That's
wonderful to meet a woman who knows him
personally that he hasn't made feel extremely
uncomfortable, glad to know there is one out
there!"

[Gallagher's MaternityWise CSOF at ¶ 63; Saldaya-Best Reply CSOF

at ¶ 63 (admitting Gallagher's MaternityWise CSOF at ¶ 63).]

Gallagher asserts that Saldaya sent the following message

("Saldaya Text Message Post") over Facebook, and that it is a

lie fabricated by Saldaya:

Got this text from a woman today:

So, little over a year ago I was contacted by a
guy named Danny who said he was a father needing
unassisted support.  Said his "wife" found my
info and wanted him to ask on her behalf.

He had a lot of questions around the benefits of
intercourse during labor.  (??)  I respectfully
and with an open heart and like an idiot, I
stayed on the phone for 10 minutes before I
realized he seemed to be really enjoying our
conversation in a way that had me uncomfortable.

He had mentioned that he has a "thriving" Doula
practice and wanted to get into the world of
supporting free birth and bringing back "Sex at
birth."  When I told him I wasn't interested in
further communication he told me to fuck myself
and hung up.

You are absolutely right to be very cautious of
him and men like him.

See Gallagher's MaternityWise CSOF at ¶ 64 (some citations

omitted) (citing Utzurrum Decl. at ¶¶ 20-21, Exh. 8A (Emilee

Saldaya's Responses to Plaintiff's First Request for Production

19

of Documents Dated October 18, 2019) at ES 000058); but see Saldaya-Best Reply CSOF at ¶ 64 (denying Gallagher's MaternityWise CSOF at ¶ 64). Gallagher also asserts that Saldaya claimed to have proof that Gallagher is a sexual predator from multiple women, including statements she had reports from forty or fifty women, although she actually did not have such proof. Gallagher's MaternityWise CSOF at ¶ 65 (citing Utzurrum Decl. at ¶¶ 20-21, Exh. 8 (Emilee Saldaya's Responses to Plaintiff's First Request for Production of Documents Dated October 18, 2019) at ES 069, 071, 072, 075, 076, 077, 080, 087, 089, 093, 094, 103, 110-111, 115, 142-143, 144, 151-169, 179-182, 201-202); Gallagher Decl. at ¶ 44, Exh. 10 (screenshots of Stephanie Byers's Facebook page as it existed on 6/12/18) at 19-20); but see Saldaya-Best Reply CSOF at ¶ 65 (denying Gallagher's MaternityWise CSOF at ¶ 65).

C. **MaternityWise/Croudace and Boulter**

On June 4, 2018, a person using a Facebook profile with the name Jess Young ("Young") posted the following statement in a review on the DTD Facebook page:

> This man is a predator, luring women into nude photo shoots, refusing to return paid-for photographs from session [sic] over a year later, selling women's nakedness to other males.
>
> After he has groomed a group of females, he pits them against one another and quietly messages individual women he has targeted as financially or emotionally struggling, and tries coercing

them into sexualized photos and videos for his profit.  There are screenshot after screenshot of this behavior, with multiple women.  The only women speaking up for him are the ones he has groomed fully and have not been contacted about sex work for him, yet.  They are victims of his as much as anyone else involved.  The fact that they are demanding evidence beyond what has already been given, shows what a masterful work this man has done to keep women from protecting one another in the birthing community.

He is a predator – beware.

[Gallagher's Decl. at ¶¶ 36-37, Exh. 4 (screenshot of DTD Facebook page showing the above statement) at p. 46 ("Jess Young Post")).[7]]  A Facebook user replied in defense of Gallagher, to which Boulter responded by posting the MOS, and stated that Gallagher "'shared their photos without their permission.'" [Gallagher's MaternityWise CSOF at ¶ 79 (citations omitted); MaternityWise Reply CSOF at ¶ 79 (admitting Boulter posted the MOS and made the statement as indicated).]  Croudace posted a thumbs-up to the Jess Young Post and a thumbs-up to both of the pages of the MOS.  Gallagher's Decl. at ¶¶ 36-37, Exh. 4 at pgs. 46-52).[8]

---

[7] PageID #: 2795.  There are no page numbers on Exhibit 4 although the page numbers cited by Gallagher appear to correspond with the numbers indicated by the Court's PDF viewing software.  Therefore Exhibit 4 is cited with reference to the page numbers assigned by the Court's electronic filing system.
[8] PageID #: 2795-2801.

D.    **Lund**

Lund posted the following statement on the DTD Facebook page: "'now you have been exposed as the predator you are and made yourself an example of WHY MEN DO NOT BELONG IN BIRTH.'" [Gallagher's MaternityWise CSOF at ¶ 91 (emphasis in Gallagher's CSOF) (citations omitted); MaternityWise Reply CSOF at ¶ 91 (admitting Lund posted the quoted statement).]  In making her post, Lund relied, at least in part, on information from persons she did not know.  [Gallagher's MaternityWise CSOF at ¶ 92 (asserting that Lund relied on information from people she did not know); MaternityWise CSOF at ¶ 92 (admitting Gallagher's MaternityWise CSOF at ¶ 92 in relevant part but denying that she relied only on information from people she did not know).]

E.    **Hopaki**

Gallagher asserts that Hopaki accused Gallagher of being a predator and that at least eighteen people saw her accusation.  Gallagher's MaternityWise CSOF at ¶ 93 (some citations omitted) (citing Gallagher's Decl. at ¶ 42, Exh. 8 (screenshots of Hopaki's Facebook page as of 6/4/18));[9] but see

---

[9] On June 3, Hopaki wrote, in relevant part: "Birthy women, beware 'male doula' Danny Gallagher. . . .  This man is a predator . . . ." [Gallagher's Decl., Exh. 8 at PageID #: 2903.]  Hopaki later wrote in a comment reply, "Maryn Green you are friends with this predator."  [Id. at PageID #: 2904.]

MaternityWise Reply CSOF at ¶ 93 (denying Gallagher's
MaternityWise CSOF at ¶ 93 in full).  Gallagher also asserts
that Hopaki accused Gallagher of using an eight-step process (in
effect the Eight-Step Message), however, Hopaki denies the
accusation.  See Gallagher's MaternityWise CSOF at ¶ 94 (some
citations omitted) (citing Gallagher's Decl. at ¶ 42, Exh. 8
(screenshots of Hopaki's Facebook page as of 6/4/18 containing
text similar to the Eight-Step Message));[10] but see MaternityWise
Reply CSOF at ¶ 94 (denying Gallagher's MaternityWise CSOF at
¶ 94 in full).  Hopaki also posted the MOS on Facebook.
[Gallagher's MaternityWise CSOF at ¶ 95; MaternityWise Reply
CSOF at ¶ 95 (admitting Gallagher's MaternityWise CSOF at ¶ 95
in relevant part).]  Next, Gallagher presents evidence that
Hopaki posted in the thread that:

> The new accounts of abuse keep flooding in behind
> closed doors.  I believe someone is compiling a
> file to provide to those who may actually need
> it, not to the woman hating naysayers who demand
> proof instead of trusting and listening to his
> victims.
>
> I've seen plenty of proof, and I trust my gut,
> but let me say this: I need no proof to believe
> women or put the dots together that a single
> childless man has no good reason to be passionate
> about childbirth.

---

[10] PageID #:2903.

Gallagher's Decl., Exh. 8 at PageID #: 2907.  The MaternityWise

Defendants admit Hopaki stated that "'she did not need any

proof'" and had "'seen plenty of proof[.]'".  [MaternityWise

Reply CSOF at ¶ 98.]

      **F.**    **<u>Byers</u>**

         Byers posted the following review on the DTD Facebook

page:

> Every interaction I have witnessed from Danny on
> social media has been passive-aggressive,
> gaslighting, and an attempt to gain sympathies
> from those struggling with internalized misogyny.
> There are so many women who are left feeling
> violated by his actions, but nobody is bothering
> to validate the subtle abuse happening to them,
> only kowtowing to this presumptuous act Danny
> puts on.  Red flags are all over this guy.

[Gallagher's Decl., Exh. 9 (screenshot of review).]  Byers also

posted, in an initial post and in a series of responses to

replies from other Facebook users, in relevant part:

> Danny Gallagher is a predator.  Women have been
> his prey for a specific audience he gets
> compromising photos for, and he is NOT a doula of
> any kind.  Be warned and steer clear.  Political
> correctness has blinded so many into acceptance
> of predators into supposed safe spaces.  Don't
> worry, I have never accepted his requests to join
> any of my groups, and he is being exposed as we
> speak.  If you are a moderator or admin for a
> birth group, I compel you to give him the boot
> immediately.  He is a PIMP.  Not a doula.
>
> . . . .
>
> I don't want to link his page here because of
> trolls, but if you search him, you'll see what a
> creep he is.  He bates women thru private

messages to send him naked photos of themselves while pregnant, under the pretense of normalizing pregnancy.  Its sick.

. . . .

Just the fact that he requests these photo shoots is one huge red flag.  I dont [sic] know of any FEMALE doulas who do that.

. . .

Screen shots of his actual conversations requesting naked photos of women . . . I'd call that proof.

. . . .

I wont [sic] violate those women's privacy to prove this guy is a predator.  Its [sic] really quite shocking it has taken this long for some women to cotton [sic] on.

. . . .

I have not been given the green light to share the evidence yet, but it is being compiled and a case is being made right now, by at least one of his victims who is speaking out.  Women are being preyed upon by this guy, so yes, I am sending out a caution for those who will benefit from such a warning.

[Id., Exh. 10 (screenshots of Stephanie Byers's Facebook page as of 6/12/18) at PageID #: 2910-11, 2913, 2916-18, 2922 (emphases and some ellipses in original).]  Gallagher also asserts that Byers was warned by another Facebook user that the comments she

was making constituted slander and defamation.  [Gallagher's MaternityWise CSOF at ¶ 102.[11]]

G.  **Kirillov**

Kirillov is also known as Bethany Kirillova on Facebook.  [Gallagher's MaternityWise CSOF at ¶ 106.]  On June 4, 2018, Kirillov posted the following review on the DTD Facebook page:

> There is much screenshotted evidence that this guy is luring vulnerable women into doing sexual videos and photography.  He has used birth photos without permission and refuses to take them down.  I have heard account after account that this guy is targeting pregnant and financially vulnerable victims.  The truth has come out and he was never a birth worker in the first place.  Do not let this man into your birthing space.  He uses the word "doula" to gain women's trust.  A doula literally means "woman servant".  This person is not a servant of women.  He is very cunning in the way he lures and traps his victims.  They feel he is charming and very helpful up front when in reality it's a way for him to profit off his sickness.  He has a strange sexual fetish for women giving birth.  He makes many ladies very uncomfortable and a few were brave enough to come forward with their evidence.  He toots his horn in a way to show how "progressive" he is as a "male" doula.  "I am special because I am a man interested in birth.  Let me grace you with my presence.." [M]any are afraid to call him out for what he is because they like the idea of accepting a male doula and they do not want to discriminate because he is a man.  I however,

---

[11] Neither Byers nor Kirillov filed a concise statement of facts in support of their joinder nor a concise statement of fact in response to any of Gallagher's concise statements of fact.  Therefore, all statements in Gallagher's MaternityWise CSOF specifically related to Byers and Kirillov are deemed admitted.  See Local Rule LR56.1(g).

> have no issue calling it what it is.  Preying on
> women.  Selling their birth pictures.  Using
> their bodies as a financial gain without
> permission.  No sir.  Birth still belongs to
> women and you're not invited!  Down with the
> patriarchy!

[Gallagher's Decl., Exh. 4 (screenshots of DTD Facebook page) at
PageID #: 2774.]  Also, "Kirillov approved of Jacob Hildreth's
(who lived on Maui) post on DTD Community page accusing
[Gallagher] of 'persuad[ing] pregnant women to do pornography'
and for [Gallagher] to 'move off Maui.'"  [Gallagher's
MaternityWise CSOF at ¶ 109 (some alterations in ¶ 109) (quoting
Gallagher's Decl. at ¶ 40, Exh. 6 (screenshots of DTD Facebook
page)).]

**H.  Best**

Best sent the Warning Post, or text substantially
similar to the Warning Post, twenty-eight times over Facebook's
direct message feature to other users with the introduction: "Hi
[name of recipient]!  I just found out some very upsetting
information about one of our mutual friends.  I had to let you
know."  See Gallagher's MaternityWise CSOF at ¶ 111; Saldaya-
Best Reply CSOF at ¶ 111 (admitting Gallagher's MaternityWise
CSOF at ¶ 111 in relevant part); see, e.g., Utzurrum Decl. at
¶¶ 35-36, Exh. 23 (documents produced with and referred to in
Vivian Chao Best's Response to Plaintiff's First Request for
Production) at VB 000001.  Best stated in the Facebook messages

that she did not have proof of the accusations she made against Gallagher.  [Gallagher's MaternityWise CSOF at ¶ 113; Saldaya-Best Reply CSOF at ¶ 113 (admitting Gallagher's MaternityWise CSOF at ¶ 113 to the extent that in some direct messages Best stated she did not have proof).]  Gallagher asserts that Best conspired with other Facebook users to destroy his reputation.  See Gallagher's MaternityWise CSOF at ¶ 117 (citing Utzurrum Decl. at ¶¶ 35-36, Exh. 23 (documents produced with and referred to in Vivian Chao Best's Response to Plaintiff's First Request for Production) at VB 026-033, 065-072).  However, Best denies this.  [Saldaya-Best Reply CSOF at ¶ 117 (denying Gallagher's MaternityWise CSOF at ¶ 117).]

## III. **Relevant Procedural Background**

Gallagher alleges the following claims against all Defendants: libel based on Defendants' defamatory statements ("Count I"); [Fourth Amended Complaint at ¶¶ 190-211;] libel per se based on the same allegations ("Count II"); [id. at ¶¶ 212-33;] trade libel based on Defendants' defamatory statements on Facebook which, inter alia, accused Gallagher of committing unprofessional and substandard services as a doula and photographer ("Count III"); [id. at ¶¶ 234-57;] false light against all Defendants for their defamatory statements on Facebook ("Count IV"); [id. at ¶¶ 258-66;] intentional infliction of emotional distress ("IIED" and "Count V"); [id. at

28

¶¶ 267-73;] and negligent infliction of emotional distress ("NIED" and "Count VI"), [id. at ¶¶ 274-79]. Gallagher also seeks: an injunction requiring all Defendants to retract their defamatory statements and preventing them from publishing any further defamatory or damaging statements against Gallagher ("Count VII"); [id. at ¶¶ 280-85;] and a declaratory judgment stating that Defendants' defamatory statements were false and harassing, in violation of the terms and conditions of the social media websites ("Count VIII"), [id. at ¶¶ 286-87].

Gallagher seeks: 1) $100,000 in economic damages and $5,000,000 in non-economic damages as to each Defendant; 2) an award of actual damages; 3) $10,000,000 in punitive and exemplary damages; 4) a permanent injunction requiring Defendants to delete any existing defamatory statements previously made about Gallagher and prohibiting Defendants from future publication of the same or similar defamatory statements; 5) an award of attorney's fees and costs; and 6) any other appropriate relief. [Id. at pgs. 104-06.]

In the Motion, the MaternityWise Defendants assert that the majority of their statements are nonactionable opinion, and the remainder are true or substantially true. The Byers Joinder, Kirillov Joinder, and Saldaya-Best Joinder present similar arguments to the Motion, except that Saldaya and Best

29

also argue their statements are not actionable under the
doctrine of qualified privilege.

## IV.  <u>Evidentiary Objections</u>

Gallagher filed numerous evidentiary objections.
[Gallagher's objections to the MaternityWise Defendants'
evidence ("Gallagher's MaternityWise Evidentiary Objections"),
filed 5/26/20 (dkt. no. 178); Gallagher's objections to Saldaya
and Best's evidence ("Gallagher's Saldaya-Best Evidentiary
Objections"), filed 5/26/20 (dkt. no. 181).]  Because Defendants
relied on evidence in their Motion, and thus sought its
admissibility, once Gallagher objected to Defendants' evidence,
"the onus was on [Defendants] to direct the district court's
attention to authenticating documents, deposition testimony
bearing on attribution, hearsay exceptions and exemptions, or
other evidentiary principles under which the evidence in
question could be deemed admissible by the district court."  <u>See
In re Oracle Corp. Sec. Litig.</u>, 627 F.3d 376, 385-86 (9th Cir.
2010).  None of the defendants filed a response to any of
Gallagher's evidentiary objections, nor did they file any
evidentiary objections of their own.  Regardless of Defendants'
failure to respond to Gallagher's objections,

> objections to evidence on the ground that it is
> irrelevant, speculative, and/or argumentative, or
> that it constitutes an improper legal conclusion
> are all duplicative of the summary judgment
> standard itself; yet attorneys insist on using

> evidentiary objections as a vehicle for raising
> this point.  A court can award summary judgment
> only when there is no genuine dispute of **material**
> fact.  It cannot rely on irrelevant facts, and
> thus relevance objections are redundant.

Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1119

(E.D. Cal. 2006) (emphasis in Burch).  Therefore, Gallagher's

objection in Gallagher's MaternityWise Evidentiary

Objections ¶ 4 to ¶ 7 of the Pavlovsky Declaration on the basis

that it is irrelevant is overruled.

Furthermore,

> A trial court can only consider admissible
> evidence in ruling on a motion for summary
> judgment.  See Fed. R. Civ. P. 56(e); Beyene v.
> Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181
> (9th Cir. 1988).  Authentication is a "condition
> precedent to admissibility," and this condition
> is satisfied by "evidence sufficient to support a
> finding that the matter in question is what its
> proponent claims."  Fed. R. Evid. 901(a).  We
> have repeatedly held that unauthenticated
> documents cannot be considered in a motion for
> summary judgment.  See Cristobal v. Siegel, 26
> F.3d 1488, 1494 (9th Cir. 1994); Hal Roach
> Studios, Inc. v. Richard Feiner & Co., Inc., 896
> F.2d 1542, 1550-51 (9th Cir. 1989); Beyene, 854
> F.2d at 1182; Canada v. Blain's Helicopters,
> Inc., 831 F.2d 920, 925 (9th Cir. 1987); Hamilton
> v. Keystone Tankship Corp., 539 F.2d 684, 686
> (9th Cir. 1976).

> In a summary judgment motion, documents
> authenticated through personal knowledge must be
> "attached to an affidavit that meets the
> requirements of [Fed. R. Civ. P.] 56(e) and the
> affiant must be a person through whom the
> exhibits could be admitted into evidence."
> Canada, 831 F.2d at 925 (citation omitted).
> However, a proper foundation need not be
> established through personal knowledge but can

> rest on any manner permitted by Federal Rule of
> Evidence 901(b) or 902.  See Fed. R. Evid.
> 901(b)(providing ten approaches to
> authentication); Fed. R. Evid. 902 (self-
> authenticating documents need no extrinsic
> foundation).

Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773–74 (9th Cir.

2002) (alteration in Orr) (footnotes omitted).  However, "the

Ninth Circuit has held that a district court's consideration of

unauthenticated evidence in conjunction with a motion for

summary judgment is harmless error when a competent witness with

personal knowledge could have authenticated the document."

Burch, 433 F. Supp. 2d at 1120 (citing Hal Roach Studios, Inc.

v. Feiner & Co., 896 F.2d 1542, 1552 (9th Cir. 1990)).

Gallagher objects to the Pavlovsky Declaration at

¶¶ 3, 4, 5, 6, 10, 19, 20, 22, 23, 27, 28, 29, 31, 32, and 33

for lack of foundation and/or hearsay.  [Gallagher's

MaternityWise Evidentiary Objections at ¶¶ 7-10, 17-19, 21, and

22.  Hearsay is an out-of-court statement offered for the truth

of the matter asserted.  Fed. R. Evid. 801(c).  "In the absence

of a procedural rule or statute, hearsay is inadmissible unless

it is defined as non-hearsay under Federal Rule of Evidence

801(d) or falls within a hearsay exception under Rules 803, 804

or 807."  Orr, 285 F.3d at 778 (some citations omitted) (citing

Fed. R. Evid. 802).  Gallagher's objections to the Pavlovsky

Declaration at ¶¶ 3, 4, 5, 6, 10, 19, 20, 23, 27, 28, 31, 32 and

33 are OVERRULED.  Although some of the statements could appear to present information outside of Pavlovsky's knowledge, <u>see, e.g.</u>, MaternityWise CSOF, Pavlovsky Decl. at ¶ 6 (stating that, inter alia, "we all looked up to Angela [Gallo] as our leader and mentor"), all statements are construed as expressing only Pavlovsky's knowledge or experience.  Also, none of the statements offer an out-of-court statement **for the truth of the matter asserted.**

Gallagher's objection to ¶ 22 of the Pavlovsky Declaration is SUSTAINED.  There, Pavlovsky offers the out-of-court statements of Ashley McClough and other, unnamed Facebook users, for the truth of the matter asserted (relating to Gallagher's conduct).  <u>See</u> <u>id.</u> at ¶ 22.  Gallagher's objection to the Pavlovsky Declaration at ¶ 29 is SUSTAINED to the extent Pavlovsky asserts that Gallagher "was also contacting women in his area, not just online," for lack of foundation as Pavlovsky does not provide a basis for that allegation.  <u>See id.</u> at ¶ 29.

Gallagher's objections to Exhibit A (his bankruptcy case docket and excerpts of the record in that case) and Exhibit B (his 2016 tax return and 2017 tax return transcript) to the Yolken Declaration attached to the MaternityWise CSOF, [Gallagher's MaternityWise Evidentiary Objections at ¶¶ 1-3,] are OVERRULED because those documents could be admissible at trial.  Gallagher's objection to Exhibit C (Facebook message

33

from Carina de Klerk describing a phone call she allegedly had with Gallagher) to the Yolken Declaration, [Gallagher's MaternityWise Evidentiary Objections at ¶ 7,] is SUSTAINED to the extent the Facebook message is offered for the truth of the matter asserted.

Gallagher also objects to the following exhibits to the Yolken Declaration: Exhibit E (screenshots of Facebook profile of Samantha Cristinzio); [Gallagher's MaternityWise Evidentiary Objections at ¶ 13;] Exhibit 12 (screenshots of Facebook messages) to Exhibit J (Gallagher Deposition Excerpts); [Gallagher's MaternityWise Evidentiary Objections at ¶¶ 15-16;] Exhibit F (screenshot of Facebook post by Angela Gallo); [Gallagher's MaternityWise Evidentiary Objections at ¶ 17;] Exhibit 7 (Screenshots of Facebook messages between Pavlovsky and Gallagher) to Exhibit J; [Gallagher's MaternityWise Evidentiary Objections at ¶ 22;] Exhibit H (screenshots of DTD Facebook page); [Gallagher's MaternityWise Evidentiary Objections at ¶ 27;] and Exhibit I (screenshots of Facebook messages and emails from and to MaternityWise and Croudace), [Gallagher's MaternityWise Evidentiary Objections at ¶ 28]. These objections are OVERRULED IN PART to the extent they argue lack of foundation, however, they are SUSTAINED IN PART to the extent the statements are offered for the truth of the matter asserted.

All of the objections in the Gallagher's Saldaya-Best Evidentiary Objections are OVERRULED on the basis that Saldaya or Best could have laid the proper foundation and can properly authenticate the documents at trial.

**STANDARD**

Gallagher alleges this Court has diversity jurisdiction under 28 U.S.C. § 1332 because Gallagher is a citizen of Hawai`i, Defendants are all citizens of states other than Hawai`i, and the amount in controversy exceeds the jurisdictional minimum.  [Fourth Amended Complaint at ¶ 1.]  As this district court has explained,

> [a] federal court sitting in diversity must apply the conflict of law rules of the forum state. Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941); Abogados v. AT & T, Inc., 223 F.3d 932, 934 (9th Cir. 2000).  Hawaii applies the most significant relationship test propounded in the Restatement (Second) of Conflicts of Laws.  Roxas v. Marcos, 89 Hawai`i 91, 117 n.16, 969 P.2d 1209, 1235 n.16 (1998); Lewis v. Lewis, 69 Haw. 497, 499, 748 P.2d 1362, 1365 (1988); Peters v. Peters, 63 Haw. 653, 634 P.2d 586 (1981); Restatement (2d) Conflicts of Laws § 145 (1971).  Under this test, "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties . . . ."  Restatement (2d) Conflicts of Laws § 145(1). Factors relevant to the application of the most significant relationship test include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the

parties, and (d) the place where the
relationship, if any, between the parties is
centered.  Id. § 145(2).  In regards to claims
involving defamatory statements published in
multiple states, these factors normally call for
application of the law of the plaintiff's
domicil, for it is there that the plaintiff can
be said to enjoy a reputation, and there that
such reputation would suffer by the accused
writing.  Hanley v. Tribune Publ'g Co., 527 F.2d
68, 70 (9th Cir. 1975); Restatement (2d) Conflict
of Laws § 150(2) & cmt. e.

Miracle v. New Yorker Magazine, 190 F. Supp. 2d 1192, 1198 (D.

Hawai`i 2001) (some alterations in Miracle).  Gallagher is

domiciled in Hawai`i, therefore Hawaii's defamation laws apply.

In Hawai`i, there are

four elements necessary to sustain a claim for
defamation:

(1)  a false and defamatory statement
concerning another;

(2)  an unprivileged publication to a third
party;

(3)  fault amounting at least to negligence
on the part of the publisher [actual malice
where the plaintiff is a public figure]; and

(4)  either actionability of the statement
irrespective of special harm or the
existence of special harm caused by the
publication.

Gold v. Harrison, 88 Hawai`i 94, 100, 962 P.2d
353, 359 (1998) . . . .

Gonsalves v. Nissan Motor Corp. in Hawai`i, 100 Hawai`i 149,

171, 58 P.3d 1196, 1218 (2002) (some alterations in Gonsalves).

A.    **<u>False and Defamatory Statement</u>**

"The threshold issue in defamation cases is whether, as a matter of law, the statements at issue are reasonably susceptible of a defamatory meaning." <u>Gold</u>, 88 Hawai`i at 101, 962 P.2d at 360 (citing <u>Fernandes v. Tenbruggencate</u>, 65 Haw. 226, 228, 649 P.2d 1144, 1147 (Haw. 1982)).  "A communication is defamatory when it tends to harm the reputation of another as to lower him in the estimation of the community or deter third persons from associating or dealing with him." <u>Fernandes</u>, 65 Haw. at 228, 649 P.2d at 1147 (citations and internal quotation marks omitted).  "Whether a communication is defamatory depends, among other factors, upon the temper of the times, the current of contemporary public opinion, with the result that words, harmless in one age, in one community, may be highly damaging to reputation at another time or in a different place." <u>Id.</u> (citations and internal quotation marks omitted).  Courts in Hawai`i have adopted the Ninth Circuit's three-part test to determine whether statements are false and defamatory: "(1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact[;] (2) whether the defendant used figurative or hyperbolic language that negates that impression[;] and (3) whether the statement in question is susceptible of being proved true or false." <u>Gold</u>, 88 Hawai`i at 101, 962 P.2d at 360 (alterations in <u>Gold</u>)

37

(emphasis omitted) (some citations omitted) (citing <u>Fasi v. Gannett Co., Inc.</u>, 930 F. Supp. 1403, 1409 (D. Hawai`i 1995), *aff'd*, 114 F.3d 1194 (9th Cir.), *cert. denied*, -- U.S. --, 118 S. Ct. 302, 139 L. Ed. 2d 233 (1997); <u>Unelko Corp. v. Rooney</u>, 912 F.2d 1049, 1053 (9th Cir. 1990), *cert. denied*, 499 U.S. 961, 111 S .Ct. 1586, 113 L. Ed. 2d 650 (1991).[12]  If the court rules that, as a matter of law, the statements are not reasonably susceptible of the defamatory meaning ascribed to it by the plaintiff, the defamation claim should not be put before the trier of fact.  <u>Fernandes</u>, 65 Haw. at 228 n.1, 649 P.2d at 1147 n.1.

Both the United States Supreme Court and the Hawai`i Supreme Court have provided guidance as to the defense that the language was figurative or hyperbolic.  In 1974, a high school wrestling coach testified in a number of hearings.  A newspaper article described the testimony as a lie.  The coach brought a defamation action against the newspaper and the article's author on the basis that the article accused him of committing perjury.  <u>Milkovich v. Lorain J. Co.</u>, 497 U.S. 1, 3-7 (1990).  The United States Supreme Court held that the defendant's statements were "not the sort of loose, figurative, or hyperbolic language which

---

[12] The outcome in <u>Gold</u> also relied substantially <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 4 (1990).  88 Hawai`i at 101, 962 P.2d at 360

would negate the impression that the writer was seriously
maintaining that petitioner committed the crime of perjury.  Nor
does the general tenor of the article negate this impression."
Id. at 21.  Therefore, a reasonable juror could conclude that
the statements implied an objective assertion of fact.  Id.

On the other hand, in Hawai`i, ex-Beatle George
Harrison's neighbors successfully established through litigation
that they had an easement over Mr. Harrison's property.  Gold,
88 Hawai`i at 97, 962 P.2d 356.  In a 1993 newspaper article
that covered the dispute, Mr. Harrison "was quoted as saying:
'Have you ever been raped?  I'm being raped by all these
people. . . .  My privacy is being violated.  The whole issue is
my privacy.'"[13]  Id. (quoting *Ex-Beatle says of trial on Maui:
Don't rob my privacy, no, no, no*, THE HONOLULU ADVERTISER,
July 21, 1993).  The neighbors brought a defamation action
against Mr. Harrison.  The circuit court granted Mr. Harrison's
motion for summary judgment  Id. at 97-98, 962 P.2d at 356-57.
On appeal, the Hawai`i Supreme Court affirmed, explaining,

> [t]he gist of Harrison's Statement was to express
> Harrison's negative opinion about the result in
> the Easement Action and to state that he felt his
> privacy was being violated; however, the
> substance of Harrison's Statement was not
> defamatory.  Although Harrison's Statement
> reflected his opinion, it could not be construed
> as a statement that Harrison believed the

---

[13] This quote is referred to as "Harrison's Statement."
Gold, 88 Hawai`i at 97, 962 P.2d at 356.

> Plaintiffs were, in fact, rapists, but was clearly rhetorical hyperbole expressing Harrison's feelings about the Easement Action.

Id. at 103, 962 P.2d at 362.

In this case, after analyzing Defendants' statements in light of the Ninth Circuit's three-part test, the Court must next determine whether the statements in question involved a matter of public concern. As the Ninth Circuit explained,

> in a private individual's defamation action involving statements of public concern, there is "'a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages.'" Milkovich, [497 U.S. at 16, 110 S. Ct.] at 2704 (quoting Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776, 106 S. Ct. 1558, 1563, 89 L. Ed. 2d 783 (1986)). Thus, "a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved." Id., at 2706.

> "'[Whether] . . . speech addresses a matter of public concern must be determined by [the expression's] content, form, and context . . . as revealed by the whole record.'" Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 761, 105 S. Ct. 2939, 2946, 86 L. Ed. 2d 593 (1985) (opinion of Powell, J.) (quoting Connick v. Myers, 461 U.S. 138, 147-48, 103 S. Ct. 1684, 1690-91, 75 L. Ed. 2d 708 (1983)). . . .

Unelko Corp. v. Rooney, 912 F.2d 1049, 1056 (9th Cir. 1990) (some alterations in Unelko). If the Defendants' statements involved a matter of public concern, Gallagher would bear the

burden of proof at trial as to whether the statements were false.  See Milkovich, 497 U.S. at 16.

### B.    **Publication to a Third Party**

"[A] defamation claim requires publication to a third party.  'The interest which is here protected is of that reputation, and for tort liability to lie for either slander or libel the defamation must be communicated to some third party other than the person defamed.'"  Gonsalves, 100 Hawai`i at 171, 58 P.3d at 1218 (quoting Runnels v. Okamoto, 56 Haw. 1, 3, 525 P.2d 1125, 1127 (1974)).

### C.    **Fault**

Of the defendants, only Pavlovsky and MaternityWise/Croudace personally communicated with Gallagher regarding the production of erotic content.  See generally MaternityWise CSOF, Croudace Decl.; id., Pavlovsky Decl.  The remaining Defendants, according to the arguments and evidence submitted, relied exclusively on third-party descriptions of Gallagher.  See, e.g., Saldaya-Best Joinder at 18 (arguing that Saldaya and Best based their statements about Gallagher on what they had seen online and heard from others).  Pavlovsky and MaternityWise/Croudace also relied on third-party accounts, but not exclusively.

With respect to the statements based on first-hand knowledge, "the question presented is whether the defendants

41

here acted reasonably with regard to the grounds they had for believing" Gallagher did the things they accused him of in their Facebook posts and direct messages.  See Aku v. Lewis, 52 Haw. 366, 376, 477 P.2d 162, 168 (1970).  Similarly, statements made in reliance on a statement from someone else are protected unless the defendant was negligent or unreasonable in such reliance.  See Aku, 52 Hawai`i at 376-77 & n.20, 477 P.2d at 168-69 & n.20 (holding that personal knowledge or a trustworthy source may reasonably be relied upon in making allegations related to criminal activity, but unverified, anonymous phone calls did not constitute reasonable grounds (citations omitted)).  "An investigatory failure alone on the part of the publisher, without a high degree of awareness of probable falsity may raise the issue of negligence . . . ."  Tagawa v. Maui Publ'g Co., 50 Hawai`i 648, 652, 448 P.2d 337, 340 (1968) (some citations omitted) (citing New York Times Co. v. Sullivan, 376 U.S. 254, 287-88, 84 S. Ct. 710 (1964)).

> D.   **Damages**

None of Defendants adequately addressed the issue of damages, therefore they did not carry their burden with respect to that element.[14]

---

[14] The only argument in the Motion related to damages is that Gallagher, not Defendants, caused his damages, which is simply a reiteration of the well-understood principal that truth
                                        (. . . continued)

E.     **Qualified Privilege**

As this district court has previously explained,

> the Court must determine, as a matter of law,
> whether the alleged defamatory communication is
> entitled to a qualified privilege.  Vlasaty v.
> Pacific Club, 4 Haw. App. 556, 562, 670 P.2d 827,
> 832 (1983).  A qualified privilege "arises when
> the author of the defamatory statement reasonably
> acts in the discharge of some public or private
> duty, legal, moral, or social, and where the
> publication concerns subject matter in which the
> author has an interest and the recipients of the
> publication a corresponding interest or duty."
> Aku v. Lewis, 52 Haw. 366, 371, 477 P.2d 162, 166
> (1970).  See also Russell v. American Guild of
> Variety Artists, 53 Haw. 456, 497 P.2d 40 (1972);
> Vlasaty at 562, 670 P.2d 827.  In claiming such
> privilege, it is essential that the author of the
> defamatory matter and the recipients have a
> common interest and the communication is of a
> type reasonably deemed to protect or further that
> interest.  Vlasaty at 562, 670 P.2d 827.

Uema v. Nippon Express Haw., Inc., 26 F. Supp. 2d 1241, 1248–49

(D. Hawai`i 1998) (footnote omitted).  However, regardless of

whether a qualified privilege exists as a matter of law,

> a finding of a qualified privilege is
> insufficient to grant summary judgment.  Rather,
> the qualified privilege is conditional and lost
> if it is abused.  [Vlasaty, 4 Haw. App. at 562,
> 670 P.2d 827.]  A qualified privilege may be

---

is a complete defense to defamation.  See Mem. in Supp. of
Motion at 33 (arguing that Gallagher caused his damages by doing
the things Defendants said he did); see also McNearney v.
Citicorp Credit Servs., Inc., No. CIV-06-576 WBS EFB PS, 2006 WL
2829849, at *4 (E.D. Cal. Sept. 29, 2006) ("A litigant who fails
to press a point by supporting it with pertinent authority, or
by showing why it is sound despite a lack of supporting
authority . . . forfeits the point.  We will not do his research
for him." (alteration in McNearney) (quoting Pelfresne v.
Village of Williams Bay, 917 F.2d 1017, 1023 (7th Cir. 1990))).

abused by the use of words not reasonably
believed necessary to protect the particular
interest for which the privilege is given. . . .
Abuse of the qualified privilege is a
determination to be made by the trier of fact.
Calleon v. Miyagi and MTL, Inc., 76 Hawai`i 310,
319, 876 P.2d 1278, 1287 (1994); Vlasaty at 562,
670 P.2d 827.

Id. at 1249.

## DISCUSSION

### I.   Count I

Defendants all argue their statements constitute non-
actionable opinion, or are substantially true.  Most Defendants
also argue that they used words like "pimp" and "predator" in a
rhetorical, hyperbolic sense.

#### A.   Pavlovsky

The MaternityWise Defendants argue that all of
Pavlovsky's statements are not actionable because they
constitute opinion, are true, or are merely rhetorical
expressions.  [Mem. in Supp. of Motion at 29-31.]

##### 1.   Capable of a False and Defamatory Meaning

Pavlovsky's Facebook statements that assert objective
facts include, but are not limited to her assertions that:
Gallagher attempted to lure Pavlovsky, and had successfully
lured Ms. Baldwin, into sex work; is a broker of naked pictures
or underwear; and is not a doula, are some, but not all, of the
statements in Pavlovsky's Facebook posts that assert objective

facts.  The general tenor of Pavlovsky's statement do not negate the impression that she is asserting objective facts. Furthermore, Pavlovsky described Gallagher as a predator and pimp in the specific context of unwanted, coercive, manipulative or otherwise unwelcome sexual activity or conversation, including accusations that he attempted to lure or groom her into taking naked pictures of herself despite her unwillingness to do so.  See. e.g., Gallagher Decl., Exh. 7 (screenshots of Kate Pavlovsky's Facebook page as of 6/4/18).  Pavlovsky's statements are distinguishable from the example in Gold where the accusation that the plaintiffs were rapists was not related to unwanted sexual contact.[15]  See Gold, 88 Hawai`i at 103, 962

---

[15] The Court is also persuaded by the reasoning in Knievel v. ESPN, 393 F.3d 1068, 1071 (9th Cir. 2005).  In 2005, motorcycle stuntman Evel Knievel sued a website owner for defamation on the basis, in part, that the website captioned a picture of him on the red carpet at an event "'Evel Knievel proves that you're never too old to be a pimp.'"  See Knievel, 393 F.3d at 1071.  The Ninth Circuit explained that, while "pimp" in isolation may be capable of a defamatory meaning, in the context of other photos of extreme sports celebrities and satirical, tongue-in-cheek captions, no reasonable reader could interpret the caption to actually accuse Evel Knievel of criminal conduct, therefore the speech fell under the protection of the First Amendment.  Id. at 1075 (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 20, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990); 1078.  Although resolved on a motion to dismiss, id. at 1071, Knievel was decided on a question of law that is relevant to both a motion to dismiss and a motion for summary judgment. In contrast to the website in Knievel, Pavlovsky used the word "pimp" in the context of accusing Gallagher of tricking, grooming, and manipulating women into sexual conduct, for his financial gain or sexual gratification, and acting as a

(. . . continued)

P.2d at 362.  Some of the terms Pavlovsky used, especially those highlighted in the Motion, might fall more easily into the category of opinion, such as "grandiose," and "egocentric."  See Mem. in Supp. of Motion at 31.  However, there is a notable difference in a phrase's susceptibility to a defamatory meaning between a phrase describing a person as "egocentric" compared to "sexual predator," or "grandiose" compared to "very aroused by birth . . . ."  For these reasons, the threshold question is answered in the affirmative because Pavlovsky's statements are capable of a defamatory meaning.

### 2. Matter of Public Concern

Next, the Court turns to the issue of whether Pavlovsky's statements involved a matter of public concern. Because Pavlovsky's statements related to Gallagher's possibly illegal or unethical practices in operating MIM and DTD, they were of interest to the general community, see Snyder v. Phelps, 562 U.S. 443, 453 (2011) (noting that matters of social and community concern were matters of public concern (citation omitted)), and thus involved a matter of public concern. Gallagher would therefore "bear the burden of proof at trial as

---

middleman or broker for sexual content or their underwear, in essence, profiting off their sexual acts.  While Pavlovsky's statement may not suggest that Gallagher was literally the manager or human trafficker of a prostitute, the context does not negate the criminal, or at least reputationally harmful, meaning of the word.

to whether [Pavlovsky's] statements were false." See Unelko,
912 F.2d at 1056 (some citations omitted) (citing Philadelphia
Newspapers, Inc. v. Hepps, 475 U.S. 767, 776, 106 S. Ct. 1558,
1563, 89 L. Ed. 2d 783 (1986)).

      Pavlovsky's statements are susceptible of being proved
true or false. With very limited exception, no admissible
evidence other than the Pavlovsky Declaration as it relates to
her July 2017 conversation with Gallagher, has been offered as
proof that Gallagher actually committed the acts described in
the Facebook posts. See MaternityWise CSOF, Pavlovsky Decl. at
¶¶ 13-18. That is, Defendants have not produced any admissible
evidence that anyone other than Pavlovsky personally had a
conversation with Gallagher where he allegedly attempted to
convince them to produce adult content, or even discussed the
subject in an unwelcome fashion. In light of the evidence in
the current record, a jury could consider the July 2017 Facebook
messenger conversation between Gallagher and Pavlovsky in
determining whether Gallagher actually attempted to lure or
groom her into sex work, act as a middleman for her pictures or
underwear, or otherwise act like a predator. A jury could also
consider the Facebook conversation between Pavlovsky and
Ms. Baldwin, and Ms. Baldwin's own interpretation of her
experience with Gallagher to find that Pavlovsky's Facebook post
claiming Gallagher had successfully lured Sam Ross into sex work

was either true or false.  See Baldwin Decl., Exh. 4

(screenshots of messages between Baldwin and Pavlovsky).

Therefore Gallagher has demonstrated that he could carry his

burden of proving falsity.  Because a reasonable jury could find

Pavlovsky's statements to be either true or false, they are not

merely shielded opinion.[16]

### 3.  Fault

Pavlovsky relied on her own experiences with Gallagher

and Ms. Baldwin, as well as third-party accounts in publishing

her statements.  It is the role of the jury to determine whether

Pavlovsky acted reasonably with regard to her July 2017

conversation with Gallagher.  Pavlovsky also relied, in part, on

third-party statements regarding Gallagher, including statements

---

[16] The MaternityWise Defendants argue that Pavlovsky's
statements were true, citing to the Dateline NBC television show
To Catch a Predator.  They assert Gallagher was factually a
sexual predator, not because he appeared on the show, but
because he lied about himself online, a character trait shared
by many people who did appear the show.  [MaternityWise Reply at
6-7.]  However, at least with regard to Pavlovsky's usage of the
term, the determination of whether Gallagher is a sexual
predator is a question of fact, therefore it is the role of the
jury to weigh the MaternityWise Defendants' To Catch a Predator
evidence, not the Court.  See, e.g., Aloe Vera of America, Inc.
v. United States, 699 F.3d 1153, 1165 (9th Cir. 2012) ("In
deciding whether to grant summary judgment, 'the judge's
function is not himself to weigh the evidence and determine the
truth of the matter but to determine whether there is a genuine
issue for trial.'  'Credibility determinations, the weighing of
the evidence, and the drawing of legitimate inferences from the
facts are jury functions, not those of a judge.'" (ellipsis
omitted) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
249, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))).

from Ms. Baldwin, and posts she saw on Facebook from people she did not know personally.  See Utzurrum Decl., Exh. 13 (Pavlovsky RFFA) at pgs. 11-12, Requests No. 19.  Reasonableness is the critical factor in determining if Pavlovsky acted with at least negligence.  A jury is uniquely competent to determine issues of reasonableness, and therefore such determinations are inappropriate on a motion for summary judgment.  Eid v. Alaska Airlines, Inc., 621 F.3d 858, 868 (9th Cir. 2010) (citing Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1157 (9th Cir. 2009)).

Thus, the Motion is denied with respect to Gallagher's claims against Pavlovsky in Count I.

**B.    Saldaya**

The same analysis applied to Pavlovsky's statements is applicable to Saldaya.  Saldaya published the Eight-Step Message, the Warning Post, and the Saldaya Text Message Post, all of which assert facts, such as an allegation that Gallagher "harassed a number of women online to sell them their used panties," or that Saldaya received a text message from someone claiming Gallagher had expressed an interest in intercourse during labor during a phone call.  See, e.g., Utzurrum Decl., Exh. 8A (Emilee Saldaya's Responses to Plaintiff's First Request for Production of Documents Dated October 18, 2019)  at ES 000041; id. at ES 000058.  Consequently, this Court concludes

49

that, as a matter of law, Saldaya's statements contained assertions of fact that are capable of a defamatory meaning, especially in light of Gallagher's doula and maternity photography businesses, because they are assertions of fact that could have a tendency to injure Gallagher's reputation. Therefore, the threshold question is answered in the affirmative.  Also like Pavlovsky's statements, Saldaya's statements involved a matter of public concern, but are provable as true or false because Saldaya, in her Facebook posts, asserted that Gallagher actually committed the acts she described.

With respect to the element of fault, Saldaya did not communicate with Gallagher personally and relied exclusively on third-party statements.  See id. at ES 000072 (stating Saldaya did not know Gallagher personally but knew of "reports" and "screenshots").  A question of fact remains as to whether the Facebook posts Saldaya relied upon constituted trustworthy sources of information, and as to the adequacy of her investigation before publishing her statements.  The reasonableness of Saldaya's reliance on her sources is a question for the jury.  See Eid, 621 F.3d at 868.

An additional issue arises with respect to Saldaya's statements because the Saldaya Text Message Post contains a statement that a reasonable person could conclude constitutes a

quotation attributed to Gallagher, describing a desire to bring

back "'[s]ex at birth.'"  Utzurrum Decl. at ¶¶ 20-21, Exh. 8A

(Emilee Saldaya's Responses to Plaintiff's First Request for

Production of Documents Dated October 18, 2019) at ES 000058.

As this district court has noted,

> [u]nlike statements made by the author or
> quotations attributed to others, under Masson v.
> New York Magazine, Inc., 501 U.S. 496, 111 S. Ct.
> 2419, 115 L. Ed. 2d 447 (1991), quotations
> falsely attributed to Plaintiff are actionable as
> defamation regardless of the truth or falsity of
> the substance of the quotation so long as the
> quote injures Plaintiff's reputation.  See
> Masson, 501 U.S. at 511-12.  A false quotation
> may injure Plaintiff's reputation by either
> "attribut[ing] an untrue factual assertion" to
> him — for example a self-condemnatory fact — or
> by portraying a "manner of expression . . . or an
> attitude the [Plaintiff] does not hold."  See id.
> at 511.

Chapman v. Journal Concepts, Inc., Civil No. 07-00002 JSM/LEK,

2008 WL 5381353, at *14 (D. Hawai`i Dec. 24, 2008) (some

alterations in Chapman).  Assuming the quote is fabricated, the

Court cannot unequivocally find that attributing it to Gallagher

would not injure his reputation as a doula and birth

photographer, and as a member of the community at large.

Therefore, the question must be presented to the jury.

Finally, Saldaya argues she and Best had a qualified

privilege as to their statements because they were "members of

various Facebook Groups whose objective is to support expecting

and post-partum mothers," and "reasonably believed that they had

a duty and responsibility to warn other women and friends of Plaintiff's involvement with activities that are considered to be inconsistent with the values [of] those Facebook Groups." [Saldaya-Best Joinder at 19-20.]  However,

> A qualifiedly privileged occasion arises when the author of the defamatory statement reasonably acts in the discharge of some public or private duty, legal, moral, or social, and where the publication concerns subject matter in which the author has an interest and the recipients of the publication a corresponding interest or duty.

Aku, 52 Hawai`i at 371, 477 P.2d at 166 (citations omitted). Saldaya's belief that she had a duty only addresses the first element of qualified privilege; it does not establish that all of the recipients of her Facebook posts and messages had a corresponding interest or duty in a way that is distinguishable from society's general interest in the allegations against Gallagher.

> To entitle a defaming declarant to the benefit of a qualified privilege, he must establish that the circumstances of the publication were such as to bring his language within the purpose of the claimed privilege.  A qualified privilege may be abused by the use of words not reasonably believed necessary to protect the particular interest for which the privilege is given.  Indeed, if the defamatory matter is totally irrelevant to the interest deserving protection or wholly unwarranted by any inquiry made, the court may declare the privilege lost as a matter of law.

Id. at 372, 477 P.2d at 166 (footnotes omitted).   Saldaya has not offered, by declaration or otherwise, any evidence to demonstrate the inquiry she undertook prior to publishing her statements.   See generally Saldaya-Best CSOF.   The Court finds that Saldaya's statements were not entitled to the qualified privilege.   Regardless, even if she did have the qualified privilege, questions of fact as to whether she abused the privilege prevent entry of summary judgment.   See Uema, 26 F. Supp. 2d at 1249.

Therefore, the request for summary judgment is denied with respect to Saldaya as to Count I.

### C.   **MaternityWise/Croudace and Boulter**

Gallagher's allegations against MaternityWise, Croudace, and Boulter are inextricably intertwined.   The gist of Gallagher's claims against Croudace is that, in addition to the statements in the MOS, Croudace defamed him by "liking" the allegedly defamatory Facebook posts of others.

At trial, Gallagher, not Defendants, would have the ultimate burden of persuasion.

> A moving party without the ultimate burden of persuasion at trial — usually, but not always, a defendant — has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.   See 10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 2727 (3d ed. 1998).   In order to carry its burden of production, the moving party must either produce

evidence negating an essential element of the
nonmoving party's claim or defense or show that
the nonmoving party does not have enough evidence
of an essential element to carry its ultimate
burden of persuasion at trial.  See High Tech
Gays v. Defense Indus. Sec. Clearance Office, 895
F.2d 563, 574 (9th Cir. 1990).  In order to carry
its ultimate burden of persuasion on the motion,
the moving party must persuade the court that
there is no genuine issue of material fact.  See
id.

Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102

(9th Cir. 2000).  The MaternityWise Defendants did not address

the concept of "defamation by Facebook like" in the Motion.

Therefore, although it presents, at best, a close question, the

Court cannot find that Croudace carried her burden of

persuasion.[17]  On that basis, the Motion is denied with respect

to Gallagher's claim against Croudace in Count I.

---

[17] The crux of a defamation claim is the substance of the
information conveyed, not the form.  "That a user may use a
single mouse click to produce that message that he likes the
page instead of typing the same message with several individual
key strokes is of no constitutional significance."  Bland v.
Roberts, 730 F.3d 368, 386 (4th Cir. 2013), as amended
(Sept. 23, 2013) (holding that a Facebook "like" communicated
approval of, and association with, a political campaign); see
also Shen v. Albany Unified Sch. Dist., Case Nos. 3:cv-CV-02478-
JD (lead case), 2017 WL 5890089, at *5 (N.D. Cal. Nov. 29, 2017)
(noting that, in a First Amendment case, in the analogous
situation of liking a post on Instagram (a company owned by
Facebook), clicking "like" "broadcasts the user's expression of
agreement, approval, or enjoyment of the post").  Thus,
Croudace's form of communication alone is not dispositive to
Gallagher's claim.  Summary judgement is a drastic device that
prevents a plaintiff from presenting his case to a jury, that
is, it deprives him of his day in court, thus the burden on the
moving party is appropriately heavy.  Ambat v. City & Cnty. of
(. . . continued)

MaternityWise argues that the MOS is not defamatory, but concedes the MOS does contain statements of fact.  See Mem. in Supp. of Motion at 25.  However, this district court has recognized that:

> Under both federal and Hawaii law, truth is a complete defense to an action for defamation.  See Garrison v. Louisiana, 379 U.S. 64, 73, 85 S. Ct. 209, 215, 13 L. Ed. 2d 125 (1964) (publication of materially true statement constitutionally protected); Wright v. Hilo Tribune-Herald, Ltd., 31 Haw. 128, 130 (1929) (truth of matter contained in publication is complete defense).  Literal truth of a publication need not be established, only that the statement is "substantially true".  Alioto v. Cowles Communications, Inc., 623 F.2d 616, 619 (9th Cir. 1980), cert. denied, 449 U.S. 1102, 101 S. Ct. 897, 66 L. Ed. 2d 827 (1981).  The proof of truth is measured by the ordinary implication of the words, i.e., the "gist" or "sting" of the alleged defamation.  Kohn v. West Hawaii Today, Inc., 65 Haw. 584, 590, 656 P.2d 79 (1982).

Basilius v. Honolulu Publ'g Co., 711 F. Supp. 548, 551 (D. Hawai`i), aff'd, 888 F.2d 1394 (9th Cir. 1989).

As noted by MaternityWise, Gallagher has failed to identify any part of the MOS that is false.  The gist of the MOS is that MaternityWise became aware that Gallagher engaged in

_____

San Francisco, 757 F.3d 1017, 1031 (9th Cir. 2014).  The MaternityWise Defendants did not address the claim at all in the Motion, therefore granting summary judgment would shift the burden onto the Court to both formulate and adjudicate their position simultaneously.  The Court declines to provide a position where the MaternityWise Defendants declined to do so.  The Court cannot conclude that the MaternityWise Defendants satisfied their burden of persuasion.

behavior it found morally questionable, specifically the consumption, promotion, and encouragement of others to create pornography, and he falsely claimed that he was certified through MaternityWise.  MaternityWise revoked Gallagher's membership. MaternityWise thanked people for providing the documented evidence, urged others to cease spreading accusations without evidence, and to allow the authorities and those involved to proceed as needed.  See MaternityWise CSOF, Yolken Decl., Exh. J (Gallagher Depo.), Exh. 11 (MOS).  MaternityWise argues all of these statements are true, and the remainder of the MOS is a statement of opinion, essentially that people should not be involved in pornography/sex work and be a doula.

Gallagher argues that "the [MOS] fails to not paint Gallagher out to be a sexual predator."  [Mem. in Opp. at 37.] He argues that references to documented evidence and the "authorities" implicitly assert that the quality of the documented evidence is high and that law enforcement was involved.  See id. at 36-38.  However, he does not dispute that MaternityWise actually possessed documented evidence.  See Gallagher's Decl. at ¶¶ 31-34.  Also, the reference to the authorities was in the context of a call for temperance and plea to not spread baseless rumors.  See MaternityWise CSOF, Yolken Decl., Exh. J (Gallagher Depo.), Exh. 11 (MOS) at Gallagher-Fed 0987 (stating "[w]e . . . would like to warn those who are

disseminating accusations without evidence that that activity is considered slander and we urge you to stop . . . ."  Please let the authorities and those who are directly involved finish the course of action as needed.")  Thus, the vague reference to authorities is not sufficient to alter the gist of the MOS.

Gallagher has offered only conclusions that the MOS is defamatory.  Conclusory assertions are insufficient to raise a genuine issue of material fact and prevent entry of summary judgment.  See F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997) (citations omitted).  Therefore, Gallagher's conclusory allegations and argument that the MOS is defamatory does not raise a genuine issue of fact.  Summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citation omitted).  At trial, Gallagher would bear the burden of proof as to the existence of a false statement from MaternityWise, an essential element of his case, however, his conclusory allegations will not suffice.

Because Gallagher has failed to establish the existence of an essential element to his case, summary judgment is granted with respect to MaternityWise as to Count I.

57

Boulter posted on Facebook: 1) the MOS; and 2) a comment that Gallagher shared pictures without permission. [Gallagher's Decl., Exh. 4 at PageID #:2796.]  Because the MOS is not capable of a false or defamatory meaning, reposting it is not a false or defamatory statement.

In response to Boulter's second statement, Gallagher explains that he posted a photograph of a person to his DTD Facebook page.[18]  The person he believes to be depicted therein contacted him and asked him to take the picture down. [Gallagher Decl. at ¶¶ 46-47.]  He does not assert that he complied and removed the picture, or that he had permission from the person to post it, instead he argues that it had been posted without permission by other people elsewhere and therefore it was in the "public domain."  [Id. at ¶ 48.]

Boulter's statement asserts an objective fact and is capable of being proved false (Gallagher either did or did not have said permission).  However, the gist of Boulter's statement is not that Gallagher ran afoul of federal copyright law, as his reference to public domain would suggest,[19] it is simply that the

---

[18] See MaternityWise CSOF, Yolken Decl., Exh. D (photograph posted to the DTD Facebook page depicting an unclothed woman holding an infant, apparently having just given birth).

[19] "The universe of inventions and creative works that are not protected by intellectual-property rights and are therefore available for anyone to use without charge."  PUBLIC DOMAIN, Black's Law Dictionary (11th ed. 2019).

woman depicted objected to Gallagher's publication of her birth photo on his website.  The only possible inference to be drawn from the statements in Gallagher's Declaration on the subject is that Gallagher knew he did not have permission to post the photo and did not take it down when the person in the photo asked him to do so.  See id. at ¶¶ 46-48.  Thus, Boulter's statement is true.  Because truth is a complete defense to a charge of defamation, and the truth that Gallagher did not have permission to post the photo is undisputed, summary judgment is warranted.

For the foregoing reasons, summary judgment is granted with respect to Plaintiff's claim against Boulter in Count I.

**D.  Lund**

Lund accused Gallagher of being a predator. Gallagher's MaternityWise CSOF at ¶ 91 (emphasis Gallagher's) (citations omitted); MaternityWise Reply CSOF at ¶ 91 (admitting Lund posted the statement "now you have been exposed as the predator you are . . .").  However, Lund's statement is distinguishable from other Defendants' use of "predator."  For example, Pavlovsky and Saldaya called Gallagher a predator in lengthy Facebook posts and messages that were also replete with factual allegations describing how Gallagher harassed or manipulated women for his financial gain or sexual gratification.  See, e.g., Utzurrum Decl., Exh. 8C (documents that were produced with and referred to in Emilee Saldaya's

59

Responses to Plaintiff's First Request for Production of Documents Dated October 18, 2019) at ES000143.  Critically, those additional factual allegations themselves were capable of being proved true or false (such as Saldaya's claims that she had evidence from forty to fifty women).  Hence, when Pavlovsky and Saldaya accused Gallagher of being a predator, the gist or sting of their statements was that they were reporting events as they actually happened, they had proof that Gallagher had actually engaged in objectively predatory behavior.  See, e.g., id. (stating that Gallagher "is a porn agent targeting low income and single moms manipulating them and pressuring [them] into selling their panties and setting up nude sites and offering to photograph them for free women have contacted me having done this and never got their photos . . . [.]").  The general tenor of Pavlovsky and Saldaya's use of the word "predator" was consistent with, and a component of, a larger assertion of objective fact.

In contrast, Lund's entire allegedly defamatory statement is a comment of one sentence.  Lund did not make any specific allegations of conduct attributed to Gallagher, she did not allege he harassed women into selling their underwear or naked pictures, nor did she accuse Gallagher of luring or grooming her (or anyone else) into sex work.  The second clause, that men do not belong in birth, states a sociological opinion.

In short, Lund used the word "predator" as an insult, an expression of aggressive disagreement, repulsion, and anger towards Gallagher, or of dissatisfaction or disapproval. Lund's objection to the presence of any men in the birth world and the absence of descriptive facts informs the reader that Lund is approaching the topic with a strong viewpoint. Thus, the general tenor of Lund's statement negates the impression that she called him a predator to assert an objective fact. Although Lund did not use predator in a figurative or hyperbolic sense because it was said in the context of other Facebook posts asserting he engaged in actual sexual misconduct, Lund herself did not repeat any of the statements she read online. Lund's statement, as a matter of law, is not capable of a defamatory meaning because a reasonable person could not read Lund's statement and conclude that she was asserting an objective fact. The threshold question must be answered in the negative.

On that basis, summary judgment is granted as to Plaintiff's claim against Lund in Count I.

### E.   Hopaki

Hopaki's statements that Gallagher is a "predator," a "pimp," "not a doula," that he "baits women in private messages," that "accounts of abuse keep flooding in," [Gallagher's Decl. at ¶ 42, Exh. 8 (screenshots of Hopaki's Facebook page as of 6/4/18)),] are all statements that a

61

reasonable jury could conclude present objective statements of fact, and that Gallagher could prove false. The general tenor of the statements, including the specific allegations of misconduct in the Eight-Step Message, does not negate the impression that the statements assert objective facts, and the terms are not used in a hyperbolic or figurative sense because Hopaki literally accused Gallagher of unwelcome sexual conduct, manipulation or trickery, and acting as a pornography middleman or broker. In contrast to Lund, Hopaki used "predator" as an assertion of fact where the gist of her statement reads like a report of Gallagher's misconduct, rather than solely as an opinion about who should be allowed to hold birth-related jobs. A reasonable reader could conclude that "predator" in the context of Hopaki's statement asserted a fact.

Hopaki's statements are capable of a defamatory meaning because they could injure Gallagher's reputation in the community. "The jury's proper role is to determine whether a published statement, held by the court to be capable of sustaining a defamatory meaning, was in fact attributed such a meaning by its readers." Partington v. Bugliosi, 825 F. Supp. 906, 913 (D. Hawai`i 1993) (citation omitted), *aff'd*, 56 F.3d 1147 (9th Cir. 1995). Therefore it is the role of the jury to determine if Hopaki's statements were actually attributed a defamatory meaning. Finally, Hopaki did not personally

communicate with Gallagher.  Whether Hopaki acted reasonably by relying on what she saw on Facebook in publishing her statements is a question for the jury.

Because genuine issues of material fact remain, summary judgment is denied as to Plaintiff's claims against Hopaki in Count I.

### F.  **Byers**

Byers's statements consist of a mixed expression of fact and opinion.  Compare Gallagher's Decl., Exh. 9 (screenshot of review) (stating "[e]very interaction I have witnessed from Danny on social media has been passive-aggressive. . . .", with id., Exh. 10 (screenshots of Stephanie Byers's Facebook page as of 6/12/18) at PageID #: 2910-11 (stating "[h]e bates women thru private messages to send him naked photos of themselves while pregnant, under the pretense of normalizing pregnancy.  Its sick.").  Although Byers included some opinions in her statements, read in their entirety, the general tenor of Byers's statements do not negate the impression that she is asserting objective facts.  See. e.g., Gallagher Decl., Exh. 10 (screenshots of Stephanie Byers's Facebook page as of 6/12/18) at PageID #: 2916 (stating "Screen shots of his actual conversations requesting naked photos of women. . . I'd call that proof[]" when asked for evidence to support her allegations of predatory behavior by another Facebook user (ellipsis in

63

Exh. 10)).  Her statements do not constitute hyperbolic or figurative language because she was specifically accusing him of the actual conduct she described.  Also, for the same reasons as stated with respect to other Defendants, her statements are reasonably provable as true or false.  Therefore, although her statements present a relatively close question as to the threshold question, it must be answered in the affirmative; Byers's statements are capable of a defamatory meaning.

Byers asserts that she did not act negligently or unreasonably in making her Facebook posts, but does not offer the grounds upon which she based her statements.  [Mem. in Supp. of Byers Joinder at 3.]  Therefore, the Court cannot unequivocally state that Byers relied on trustworthy sources, acted reasonably, or conducted a satisfactory investigation into the truth of her allegations before publishing her statements about Gallagher.

Thus, summary judgment is denied with respect to Plaintiff's claims against Byers in Count I.

G.    **Kirillov**

Although some of Kirillov's statements expressed her protected opinion that the birth world belonged to women, she also stated assertions of fact, including that Gallagher is not a doula, has a "sexual fetish for women giving birth," targets pregnant and vulnerable women, preys on women, and "sell[s]

64

their birth pictures."  See Gallagher's Decl., Exh. 4

(screenshots of DTD Facebook page) at PageID #: 2774.  A

reasonable jury could conclude that Kirillov's statements are

objectively false and defamatory, and have a tendency to injure

Gallagher's reputation.  Kirillov did not base her statements on

any personal interactions with Gallagher.  The reasonableness of

her reliance on what she had seen online in making her

statements is a question of fact for the jury.  Therefore, the

Court cannot conclude as a matter of law that there is no

genuine dispute of material fact as to whether Kirillov's

statements were defamatory.  For these reasons, summary judgment

is denied with respect to Plaintiff's claims against Kirillov in

Count I.

**VII.  Best**

Because Best published the Warning Post, [Utzurrum

Decl. at ¶¶ 35-36, Exh. 23 (documents produced with and referred

to in Vivian Chao Best's Response to Plaintiff's First Request

for Production) at VB 000001,] for the reasons previously

explained, her statements are capable of defamatory meaning and

capable of being proved false.  Also, Best did not base her

statements off of a personal interaction with Gallagher, but

relied only on what she read online.  Therefore, the Court

cannot unequivocally conclude that she was not negligent or

unreasonable in publishing her statements.  Finally, for the

same reasons as explained with respect to Saldaya, Best has not established that she had a qualified privilege.  Even if she had, a qualified privilege does not necessitate the entry of summary judgment because whether there was abuse of the privilege is a question of fact.

For these reasons, summary judgment is denied with respect to Plaintiff's claim against Best in Count I.

**II.  Remaining Causes of Action**

Defendants argue that summary judgment should be granted as to all causes of action on the basis that Gallagher failed to demonstrate an underlying defamatory statement in Count I.

As this district court has explained,

tort claims which are found to be artfully pled defamation claims are disallowed where the defamation claims themselves are invalid as a matter of law.  See Dworkin v. Hustler Magazine, Inc., 867 F.2d 1188, 1193 n.2 (9th Cir. 1989); Leidholdt v. L.F.P. Inc., 860 F.2d 890, 893 n.4 (9th Cir. 1988); Gold, 88 Hawai`i at 103, 962 P.2d at 362.  As such, a plaintiff cannot maintain a separate cause of action for emotional distress, false light, disparagement of trade, or tortious interference with business where the gravamen of his claim is defamation.  See Dworkin, 867 F.2d at 1193 n.2 (noting that an "emotional distress claim based on the same facts as an unsuccessful libel claim cannot survive as an independent cause of action" (quotation and citation signals omitted)); Gold, 88 Hawai`i at 103, 962 P.2d at 362 (dismissing plaintiff's derivative claims for false light, invasion of privacy, IIED, and negligence where court found statement was not defamatory); Unelko, 912 F.2d

> at 1057–58 (noting derivative claims for
> disparagement, "trade libel," and tortious
> interference with business are "subject to the
> same first amendment requirements that govern
> actions for defamation"); see also [Hustler
> Magazine v.] Falwell, 485 U.S. [46,] 57 [(1988)]
> (noting when defamation claim fails because
> defendant's speech is constitutionally protected,
> a claim for emotional distress "cannot,
> consistently with the First Amendment, form a
> basis for the award of damages"); Basilius v.
> Honolulu Publ'g Co., 711 F. Supp. 548, 552–53 (D.
> Haw. 1989) (citing case for proposition that
> "First Amendment defenses are applicable to all
> claims, of whatever the label, whose gravamen is
> the alleged injurious falsehood").

Chapman, 2008 WL 5381353, at *19 (analyzing defamation claims

under the more demanding "actual malice" standard rather than

negligence).  Therefore, summary judgment is also granted as to

Plaintiff's claims in Counts II-VIII against MaternityWise,

Boulter, and Lund.  However, with respect to all other

Defendants, no arguments specifically addressing the remaining

claims have been presented.  Summary judgment is accordingly

denied as to all causes of action for the remaining Defendants.

<u>**CONCLUSION**</u>

For the foregoing reasons, the MaternityWise

Defendants' Motion for Summary Judgment, filed April 20, 2020,

is HEREBY GRANTED IN PART AND DENIED IN PART.  The Motion is

GRANTED insofar as summary judgment is granted in favor of

MaternityWise, Boulter, and Lund as to all of Gallagher's claims

against them, and the Motion is DENIED as to Plaintiff's claims

against Croudace, Hopaki, and Pavlovsky.  The Saldaya-Best

Joinder, Kirillov Joinder, and Byers Joinder, all filed

April 23, 2020, are DENIED.  The Clerk's Office is DIRECTED to

terminate MaternityWise, Boulter, and Lund as parties on

**February 11, 2021**, unless Gallagher files a timely motion for

reconsideration of this Order.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, January 27, 2021.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

DANNY GALLAGHER VS. MATERNITYWISE INTERNATIONAL, ET AL; CV 18-00364 LEK-KJM; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND JOINDERS THEREIN